We'll hear argument first this morning in Case 18-935, Manasky v. Taglieri. Mr. Tehrani? Mr. Chief Justice, and may it please the Court, the Hay Convention on the Civil Aspects of Child Abduction is designed to protect children who have a country of habitual residence from the harmful effects of wrongful removal from that country. In this case, however, the convention was applied to separate two-year-old A.M.T. from her mother, the only caregiver A.M.T. had ever known, and to return the child to Italy, a country where A.M.T. had spent only the first eight weeks of her life. The Sixth Circuit's decision upholding A.M.T.'s return to Italy rests on an erroneous definition of habitual residence. The Sixth Circuit held that A.M.T.'s parents could share an intent to raise A.M.T. in Italy, even if they had no meeting of the minds. The Court never explained how parents can share an intent about where a child will live if there is no actual agreement between them. Tellingly, neither Taglieri nor the United States defends the Sixth Circuit's habitual residence standard. They instead urge this Court to adopt an amorphous all-relevant-circumstances inquiry. But in cases involving infants, the foreign jurisdictions on which Taglieri and the United States rely actually apply a different habitual residence standard. That standard focuses on the primary caregiver's connections to the country of removal, a far more appropriate inquiry. Ultimately, however, under any of the competing definitions of habitual residence and standards of review, the outcome of this case is the same. Eight-week-old A.M.T. was not habitually resident in Italy. Indeed, the District Court's unchallenged finding that Monaski intended to return to the United States with A.M.T. as soon as possible is virtually dispositive. This Court should put an end to this already four-year-old litigation by entering an order directing A.M.T.'s return to the United States. I'd like to turn first to the definition of habitual residence. The Sixth Circuit applied a shared parental intent standard in name only because it held that A.M.T.'s parents could share an intent for her to live in Italy, even if they had no meeting of the minds or actual agreement on that issue. Ginsburg. Mr. Tehrani, a problem with your position, I take it your view is this child taken to the United States at eight weeks old has no habitual residence? Tehrani. That is our position, Your Honor. Ginsburg. And if that's so, then there are many children who would not be covered by the Convention. The whole idea of the Convention was to stop unilateral decisions to move a case of very young children. Tehrani. With respect, I disagree with the proposition that our approach would lead to a large number of children who do not have a country of habitual residence. First of all, we're talking in this case only about infants. Older children are evaluated under a different standard, and in all likelihood, based on their connections, their acclimatization to the country in which they reside, they would have a country of habitual residence. Even with respect to infants, we're dealing here with the unusual case where the breakdown of the party's relationship was simultaneous with Monaski's pregnancy and the birth of the child. In any case where the breakdown of the relationship occurs later in time, in all likelihood, there will be an agreement between the parents as to where the child will live for at least the foreseeable future. But from the standpoint of the objectives of the Hague Convention, there's nothing wrong with recognizing that a subset of children will have no country of habitual residence. Because the problem with the standard that says if the parents have to have an agreement, in many of these cases, the relationship between the parents is so acrimonious that the likelihood of a actual agreement is slim to none. That would only be the case, Your Honor, if the acrimony was simultaneously with the pregnancy and birth. In other cases involving infants, the breakdown of the relationship may occur later in time. And if there was a meeting of the minds after the child's birth, that would be controlling. A single parent could not unilaterally disavow that agreement. But from — You think this agreement is irrevocable? If there's a — I doubt that there are going to be very many cases where there's a written agreement. So you think that if at the beginning, at the time of the child's birth, there's a tacit agreement between the parents, that's irrevocable? And then if the relationship breaks down over a period of time that — where you might otherwise infer that there is no longer any agreement, that would not count? That's exactly our approach, Your Honor. The agreement, once it's in place, is irrevocable until the standard for older children comes into play, which would be an acclimatization-based standard. But for infants, once the parents have reached a meeting of the minds, a single parent cannot unilaterally disavow that agreement. Counsel, we're — we're talking about an international convention, and yet none of the other parties to the convention have adopted your position. The courts of Canada, the U.K., the E.U., Australia, and others have, in fact, rejected it. We have said one of the important guiding principles in interpreting the convention is what the other countries do. Why should we depart from that guideline here? Your Honor, every circuit that has addressed this issue applies some version of the shared parental intent standard to infants. Some circuits apply the additional actual agreement requirement that we're urging this Court to adopt. But every circuit applies some version of shared parental intent. Well, but I'm — you don't dispute the fact that no other country, no other signatory to the convention, has adopted your position. I don't dispute that, Your Honor. But to the extent that this Court is inclined to follow the approach of foreign jurisdictions, then the relevant test here is not the all-relevant circumstances test advocated by Taglieri and the United States. It's the primary caregiver-focused standard that the relevant foreign jurisdictions actually apply in cases involving infants. And that's the E.U. Court of Justice in the Mercury decision. It's the U.K. Supreme Court in the A v. A decision. It's the Australian High Court in the L.K. decision. All of those courts have recognized that in cases involving infants, it's the primary caregiver's connections to the country of removal that determine whether the infant has a country of habitual residence. Get that out of my red-and-cheeked opinion. And it seems to me that she made a huge point, that this is family law. You know, families differ. There are vast differences. And don't treat these words, habitual residence, as if it's like a black-letter tax code. They're more like a factual matter. And let the judge who's closest to it, even though he's not a family court judge, unfortunately, it's a federal system because it's a treaty. Let them hear all the evidence and decide it. And that's it. I mean, not 100 percent it, but that's it. And as soon as nine people who know, speaking for myself, know very little about this, start laying down black-letter standards, all we're going to do is maybe help people in some cases and just cause chaos and hardship in others. That's basically what I got out of her opinion. It seems to me that's the British courts. And that sounds pretty sensible to me. Your Honor, the U.K. Supreme Court makes clear that while an all-relevant circumstances test is generally appropriate, in the case of an infant, the infant's connections to her environment are formed through her primary caregiver. That may be in some cases. That may well be. And in other cases, maybe it isn't. I don't know every family in the world. And so, I mean, maybe we even read it differently, but I've really read Justice Hale's opinion as just saying what I just said. So, judge, be careful. This is factual. It involves families. Don't adopt a standard. Just let them apply these words. Now, where does it, where is that, where did I get it wrong? Your Honor, the U.K. Supreme Court follows the approach of the European Union Court of Justice in the Merkredi decision. And Merkredi makes very clear that in cases involving infants, a primary caregiver-focused approach is the test that should be applied. But under any of the competing tests that we're discussing here today, the outcome is the same on these facts. Can I ask you a question about your position that somewhat puzzles me? You think that in this case, the dispositive question is whether there was an agreement between the parents. Am I right? Yes, Your Honor. And then you say that there should be review de novo. But that's a, if the question is whether there was an agreement between the parents, isn't that a pure question of fact? Why would it be reviewed de novo? It would be reviewed de novo, Your Honor, because while historical facts would be a mixed question of law and fact. Why is it a mixed question? Was there an agreement between the parents or was there not an agreement between the parents? It's a question of fact, pure fact. Because there does not need to be a written agreement. There doesn't even need to be an express oral agreement. An agreement can be — It is just as much a question of fact as a reasonable suspicion or probable cause determination, which this Court has held would be — No, because those involve the application of a complicated legal standard. Your Honor, the fact that we're here today would suggest that the habitual residence standard is less than straightforward. Lower courts are in need of guidance from clear legal principles about how to make a habitual residence determination, just as lower courts need guidance about how to ascertain the existence of reasonable suspicion and probable cause. This Court emphasized the need for clear guidance in the Ornelius case where it held that probable cause and reasonable suspicion are reviewed de novo. And it's not only courts that need guidance. It's parents who are confronted with these difficult decisions about whether to remove a child from a dangerous situation. They need to know, if a child is removed, what is the likelihood that the child will be returned under the Hague Convention. But it's over and over in the history of this convention is that they don't want any rigid tests. They don't want domicile. They don't want nationality. They want a totality of the circumstances. And the government points to the Seventh Circuit case, the Redmond case, and say, no one factor should be considered controlling. You just take all the factors and a district judge should weigh those and come to a conclusion. Your Honor, the problem with that approach is that it will breed disuniform outcomes. It will prolong Hague Convention litigation. It will undermine the deterrent effect of the Hague Convention by undermining the clear rules that would otherwise apply in this setting. But to the extent that this Court is inclined to look at the approach of foreign courts, we would urge the Court to adopt a primary caregiver-focused standard. If the Court applies an all-relevant circumstances test, however, it is essential that this Court not only adopt that standard, but then go on and apply that standard to the facts of this case. The Hague Convention sets a goal of resolving these cases within six weeks. This case has been going on for four and a half years. Under Article II of the Hague Convention, signatory states have an obligation to use the most expeditious procedures available to resolve these cases. On the standard of review, doesn't de novo review necessarily prolong the matter? I don't think so, Your Honor. De novo review facilitates the development Because it's going to push everything into the Court of Appeals than re-arguing everything that's already been decided by the district court without any deference. So people will take appeals much more readily. Given the stakes in these cases, it's likely that the losing parent in the district court will appeal whatever the standard of review is. De novo appellate review promotes the development of clear legal principles that district courts can apply more readily, more expeditiously, and that appellate courts in turn can also apply in an expeditious manner. If this Court adopts an all-relevant circumstances test, then it would be displacing the shared parental intent standard that every circuit applies, which is why it is of overriding importance that this Court Every circuit, not the Seventh Circuit. That is not a case involving infants, Your Honor, the Redmond case. Every circuit that looks at the habitual residence of an infant applies a test that looks to shared parental intent. Some circuits also look at actual agreement as part of that shared parental intent inquiry. The need for guidance from this Court is of surpassing importance because this Court would be adopting for the first time an all-relevant circumstances test that no lower court currently applies in a case involving infants. In order to live up to the United States' obligation to use the most expeditious procedures available to resolve these cases, this Court should not only adopt a standard and a standard of review and a definition of habitual residence, but should go on and brought to an end so that district courts have guidance about how the habitual residence standard will be applied. On the facts of this case. Ginsburg. How will it be brought to an end? The child is now in Italy, and no doubt the Italian courts would weigh in. So this determination of habitual residence is not going to settle where this child the custody of this child? That's correct, Your Honor. Hague Convention cases don't determine custody. They determine the venue in which child custody determinations will be made. The appropriate venue for this child custody determination is the United States. And, in fact, there has been no child custody determination in Italy. The Italian courts refused to make that determination because Manaski's parental rights were terminated in an ex parte proceeding of which she had no notice and no opportunity to be heard. If AMT is returned to the United States, then there will be a full and fair child custody hearing. But that would depend on the Italian authorities returning her. And given the position that they have taken up until now, that seems most unlikely. Your Honor, we believe as a matter of comity that the Italian courts would return AMT and would adhere. Did the courts that has declared her a nonparent do that? Your Honor, as a matter of comity, we believe that the Italian courts would adhere to an order from this Court directing the re-return of AMT. There is precedent for foreign courts following re-return orders. In the Larbi case, which is one of the cases that this Court cited in its chafing opinion as an example of a case where a district court issued a re-return order, the case went all the way up to the U.K. Supreme Court as to whether to adhere to that re-return order. And the U.K. Supreme Court ordered the child returned to the United States. There hasn't been any case where we're talking about a time in the other country as long as this. This would be the longest period of time in which any re-return order has been entered, wouldn't it? I don't know if it is the longest period of time. To the extent that Taglieri has concerns about the propriety of re-return, those are issues that he could raise before an Italian court when we move to enforce the re-return order. But in the absence of a re-return order, the grave error committed by the lower courts will remain unremedied, as this Court held in the Chafin case. A re-return order is typical appellate relief. But I'm not interested, hypothetically, oddly enough, in the law. Suppose I were interested in how do we get to what's in the best interest of the child. Look at it from that point of view. What do we do? And I also think judges, particularly Federal judges, don't know much about this. So in Italy, is there a family court? Or what's — what do I do? I don't know. This is a genuinely open question. I don't know what to do if my object is to try to secure the best interest of the child. And you're familiar with this case? You tell me. Your Honor, the best interest of the child would be furthered by returning AMT to the United States so that there can be a full and fair child custody hearing at which a State court judge, steeped in family law issues, can make a determination about who should have custody and what is, in fact, in AMT's best interest. But in the absence of a re-return order, no court — I'm sorry. I thought that there was a special order of the Italian court giving the mother some visitation rights, I'll bet limited. It's not clear to me that you're representing to me that there is no method or procedure to reopen or revisit the custody issue? I'm not representing that there is no procedural — So assuming, as I do, that there has to be something that can secure greater rights for her, why should it be here instead of there, assuming — and you don't want me to assume this — that the totality of the circumstances suggests that she has acclimated? Your Honor — I mean, after two and a half years, even under the convention, you don't have to return a child who's been settled for a greater — greater than one year. So — That's correct, Your Honor. That does not bear upon the availability of a re-return. No, of the return, but I still am wondering why it is that it's the American court rather than the Italian court who should be dealing with the custody issue. Well, first of all, because Italy was not AMT's country of habitual residence, so she never should have been returned to Italy in the first place. The only way to remedy that wrong — Well, that's a really interesting question because I'm not sure, unless we accept your premise, that the mother's intent controls, but she was only here a couple of months when the father sought re-return of her. So it's hard to say she was acclimated in those couple of months either. But, Your Honor, the question is whether AMT had the type of meaningful, settled, stable existence in Italy when she was removed at eight weeks of age to establish a habitual residence there. How old is the child now? She is four and a half years old, Your Honor. AMT did not have that type of existence within her fleeting eight weeks of living in Italy. The Hay Convention is designed to protect children who have a stable, settled existence. That is what is explained in paragraph 72 of the accompanying explanatory report. There will be some children, such as AMT, who don't form those types of settled connections to a country and whose return to the country of removal is actually detrimental to the interests. Let me understand. Your position is that she had no habitual residence at that time. That's correct, Your Honor. Is that correct? Not that she had habitual residence. All right. So either parent at that time could snatch her and possession would be ten-tenths of the lot, right? The Hay Convention would not speak to that removal, Your Honor. That doesn't mean that the left-behind parent would be without remedies. The left-behind parent could seek relief, for example, under the Uniform Child Custody Jurisdiction and Enforcement Act. The left-behind parent would have the opportunity to participate in a child custody hearing in the country of removal. But the convention which was meant to solve this problem of a unilateral removal would not apply. The convention would not apply if a child had no country of habitual residence. But as the very foreign jurisdictions on which Tanglieri and the United States rely, including the U.K. Supreme Court, the Australian High Court, and courts in New Zealand have recognized, not every child will have a country of habitual residence. How long does the child have to – how old does a child have to be before you would say they have a habitual residence? Eight weeks, under your theory, is not enough, but one year, two years? Well, at a certain point, around 18 to 24 months, the focus would shift to the child's own acclimation to his or her surroundings because the child – Where do you get that number from? Based on the development of a child, child psychology, at a certain point, the lower courts shift their test from shared parental intent to acclimatization once the child has formed his or her own connections. Under the shared parental intent standard for inference, the inquiry looks at whether the intent of the parents is a proxy for the type of settled, stable, meaningful ties that an older child would be able to form. And there will be some children who do not have a country of habitual residence because they did not form the type of settled, stable ties that the Hague Convention is designed to protect. Returning a child to a country where it did not have meaningful connections is just as harmful to that child as permitting the child's removal from a country of habitual residence. Mr. Girani, Judge Boggs suggests that in the case of children, children who have lived in a single place for their entire lives – in the case of infant children, that is – who have lived in a single country their entire lives with both parents, that the usual rule should be that's their habitual residence, not irrebuttable, but that that should be the usual rule, that that's their habitual residence. And that's certainly a very administrable rule. It provides a lot of guidance. And it deters anybody, either parent, from taking the child anywhere else, which seems to be a value, too. So why isn't the Judge Boggs rule the right one for infants? The problem with that approach, Your Honor, is that it conflates a child's residence with her habitual residence. If the signatories to the Hague Convention had wanted to enact an agreement that was all-encompassing, that applied to all children, they would have prohibited the removal of a child from his country of residence without the approval of both parents. What they instead did was enact a more targeted provision that prevents the wrongful removal of a child from his country of habitual residence, because the signatories recognize that removing a child from a country of habitual residence where the child has meaningful ties, has a stable existence, would be harmful to the child. But they also recognize that returning a child to a country where it lacks those ties, it lacks those connections, would be just as harmful to the child's interests. That is the fundamental problem with the one-country rule advocated by the panel in the Sixth Circuit. But whatever the test is that this Court adopts, the outcome is the same. The facts are overwhelming here, that as a result of the physical and sexual abuse to which Minaski was subject, she formed the intent during her pregnancy to return to the United States with her child as soon as possible. That's what the district court found at Pet. App. 94A, that Minaski intended to return to the United States with AMT as soon as possible. And that's what she did. The day that AMT's U.S. passport arrived, Minaski left and returned to the United States, fled from the dangerous situation in which she found herself. The signatories to the Hague Convention would never have intended to prevent a mother from removing her child from those dangerous circumstances. Breyer. Why? That's a question I have here. Of course there's child abuse or spousal abuse raised throughout this, which is a serious problem. So why does this case not involve Article 13, where you don't return a child if there is a grave risk that his or her return would expose the child to physical or psychological harm, or otherwise place the child in an intolerable situation? That provision would seem designed for the problem of spousal abuse. Why isn't it here? Mr. Chief Justice, may I answer the question? Your Honor, we did urge the district court to apply the exception for grave risk of harm to AMT. Unfortunately, lower courts have construed that exception narrowly. And in this case, even though the district court credited Minaski's allegations about the extensive physical and sexual abuse to which she was subjected, the court concluded that that abuse directed to Minaski was not sufficient to create a grave risk of harm to AMT. Thank you, counsel. Mr. Joshi. Mr. Chief Justice, and may it please the Court. Habitual residence is a flexible, fact-intensive concept. That's precisely why the drafters and ratifiers of the Hague Convention picked it over the alternatives, like domicile or nationality. It asks a very straightforward question. Where does a child usually live? Where is the child at home? Answering that question requires looking at the case-specific facts on the ground, unencumbered by rigid mechanical per se tests. That includes Petitioner's rigid mechanical per se test about a shared or, I'm sorry, a subjective agreement or a meeting of the minds. That is not necessary to establishing a child's habitual residence. It's not even necessary to establishing a shared parental intent, which itself is not necessary to establishing habitual residence. And that test applies equally to infants and to older children. Nothing in the Convention's text or structure suggests that habitual residence carries a different definition depending on the age of the child. So that takes care of one question presented.  This Court's framework in U.S. Bank or Lakeridge applies. And there's no reason to deviate from that rule. In fact, that rule would also provide, we believe, the most consistent results, including consistency of outcome, as Petitioner asks for. Because the best way to be consistent is to be right, and the best way to be right on a fact-intensive question is to trust the district judge. So this is what puzzles me about your position, which does seem to reflect the decisions of foreign courts, and maybe something has just been lost in translation. But it's fine to say, take everything into account and be flexible. But that's not very helpful unless one knows the question to be answered after taking everything into account and being flexible. And so the critical point is what is meant by habitual residence. Now, you said it's where the child usually lives. If that's the test that Judge Boggs had, I understand it. But if it's something more than that, then I really don't know what habitual residence means. So we think where a child usually lives is the test, and it's sort of hard to explain it more than that. In most cases, it's going to be quite easy to tell where the child usually lives, including for infants. I mean, I would wager if you walked on the streets of D.C. and found parents with infants and said, where does your infant child usually live? They'd say, with us at home. And it's oftentimes when these cases are in dispute, when habitual residence is in dispute, and it's a very small fraction even of Hague Convention cases, in those situations, it's going to be very hard to come up with an ex ante rule or test that's going to be useful in that circumstance. Well, what if the parents live from the time of the child's birth until the time when the issue comes up in a particular country, but it was never their intention to stay there permanently? Would that country be where the child usually lives? That's a very difficult question, and I can imagine many factors that might push you one way or the other. For example, if that's where they had been living for quite some time but just had some future plans to move, that might well be where the child was usually living on the date of the or, you know, immediately before the wrongful retention or removal, as Article III calls for. On the other hand, if you're telling me that, in fact, they have a permanent residence in another country, and they were, you know, in the country of birth just on vacation, and she went into early labor and the child was born there, but all their connections are back in the other country, it might be a much more difficult question. The point is where habitual residence is disputed in the small fraction of cases, there's very little ex ante guidance that's going to be useful except to say the question is where does the child usually live, or if it helps to think of it this way, where is the child at home? And so you have a meaningless concept where the child usually lives if you're talking about somebody who's 8 weeks old. I mean, it's not as if they've laid down roots. Eight-year-old, 8-week-old infants don't have habits. Well, other than one or two. But it doesn't seem to me that that's the notion that the convention drafters were looking at. It isn't. And I think it's important to realize that, although the word is habitual, the term habitual residence and the use of the word habitual originated in the Hay Convention in French. And the English copy here is official, but nevertheless, the term habitual residence began as — I'm not even going to attempt to pronounce it in French, but habitual in that context translated means usual or customary. It doesn't necessarily mean as a habit. And I think it's important that in the ordinary case, even an infant, as I said, I think ask the parents of any newborn, and I think if you ask where do you usually live, they would have an answer, just like — Kagan. But does that mean Judge Boggs is right, that the place where an infant usually lives is the place where the infant has lived since birth with both parents? Judge Boggs may well be right, and he did add the qualification for absent unusual circumstances. Absent unusual circumstances, right. And I think that's perfectly fine. I think the problem, though, is if there's any sort of guidance like that coming from this Court, lower courts will tend to rigidly follow it instead of answering the ultimate question, which you asked about earlier, which is where does the child usually live, as a practical matter and as a, you know, and in theory, the judge can consider facts that are relevant to that question, and of course that itself is a constraint. And the problem with your solution, on the two questions presented, I take it you agree with Respondent. But you said the bottom line should be a remand, not a determination. And this child is now four and a half years old. To remand, to do what? What factor didn't the district court take into account that the district court should have taken into account? You say totality of the circumstances, not to share an intent as a single factor. But it seems to me that the district court did have everything before it. What, if we remanded, what should the district court do that it hasn't already done? So, Justice Ginsburg, we don't take a position on the outcome of this case. The Court's usual practice when announcing a new standard is to remand. The only thing I'll say is that both the court of appeals and the district court appear to view the facts through the lens of a notion that shared parental intent was the only thing that mattered. And probably the parties briefed the case that way in the court of appeals, all to shared parental intent. To the extent there are other facts that might have been germane to determining where the child usually lives that the parties didn't bring forward, you know, we just don't know. I don't know, and it's hard to predict. You know, I would, as an example, I'll give you a very recent case that's posted on the Hague Convention site that tracks cases under the convention. It's called X against Y. Those are pseudonyms, obviously, from the court of appeals of the Hague. Mom alleged that the apartment in the Netherlands was where they usually lived. Apartment in Spain was a vacation home. Dad alleged exactly the opposite. Court had to decide who was right. Looked at a lot of facts on the ground, but the most compelling one that the Court decided would tip the issue was that the mom had deregistered herself from the municipal person's database and put Spain as her forwarding address, and deregistered the company she ran from the Dutch Chamber of Commerce. It's impossible to predict that that was going to be the fact ex ante, but when you're looking at where the family in that case or the child usually lives, it's the parties who are going to come forward with evidence, and the judge is going to assign, decide whether it's relevant, and if it's relevant, assign weights to it. Breyer. So shall we do agree, then, with Lady Hale's observation in terms of a young child, infant, and parent intent, shared parent intent? She says that these common-sense observations are best seen as helpful generalizations of fact, which will usually but not invariably be true, not as propositions of law. So Hale, Boggs may be right, except that he's calling it a proposition of law. I would agree with that, and I would just, again, I would caution this Court from laying down principles like that, because when this Court says it, lower courts usually take it as propositions of law. Well, then, if that's so, then is it the less risky path to send it back? If we say it and don't send it back, more likely to be taken as laying down propositions of law. That may well be true. What do you think? So we don't take a position on it? Other than to say, you know, ideally this Court's opinion will say that habitual residence is a... No, you don't have to take a position, but I find it rather difficult, so can you help me? Again, as I said, it's where the child usually lives, and with the facts we know... I'm sorry. Where did you get that standard? I look at the European Court, and it had a different standard. It says some degree of integration by the child in a social and family environment. That's the definition the Bates Court, Lady Hale, adopted. I think once we say where a child ordinarily lives, we fall into the trap that you had, which is, I think courts will be focusing on ordinary out of context. Are you disavowing what the other courts are doing? No, we're not, if I may, Mr. Chief Justice. We think they are looking at the right question, which is where the child ordinarily lives, in difficult cases. Oftentimes... No, that's a translation. They didn't use those words. We think the words they use are certainly relevant to that ultimate determination, and in any event, that is what the text of the Convention says, and we think that's what the Court should apply here. Thank you, counsel. Mr. Pincus. Thank you, Mr. Chief Justice, and may it please the Court. Just to pick up on Justice Sotomayor's question, I think the European and U.K. courts have talked about the family and social environment in which the child's life has developed. I think that, to me, is not that different from where the child usually lives. It may avoid the problem of duration. I think a lot of the problems in these cases sometimes result from the fact that habitual residence into a U.S. ear may connote some degree of permanence, but the courts, the foreign courts, have made clear that that actually isn't the case. It doesn't require permanence. It's just what's usual during the period before the allegedly unlawful return. We agree with the SG regarding the test, and I just wanted to start by saying a few words about Petitioner's actual agreement test. As Justice Ginsburg pointed out, it would largely eliminate the Convention's protection for very young children because they would have no habitual residence, and because one of the spouses in the cases where there is marital discord during the pregnancy and the birth could simply say, I withhold agreement on where the child should live, and that would mean there was no habitual residence as long as there was no agreement. That's obviously a significant gap. Petitioner cites some cases saying that a child may not have a habitual residence, but I think it's important to point out that those statements were made in a very different context, which is actually the one presented in the very large majority of decided Convention cases, and that's the situation where the child and the parents live together in Country A. Then the child moves to Country B with one or both parents. It could be a temporary stay with grandparents. It could be for a job. And then the parent who is with the child in Country B says, I'm not sending the child back. And so the question is, what is the child's habitual residence, Country A or B? And courts have said in that circumstance it's possible to lose the habitual residence in A before gaining it in B. Whether that's true or not, that's obviously a very different situation from the case where the parents are in one country and the child is born there and stays there until the challenge removal. And we agree with Judge Boggs, as a factual matter, not as a legal principle, that those facts are very likely to lead to the conclusion that the child's habitual residence is that country, absent unusual circumstances. There can be different facts. The child is born on vacation. The child is born at a place of birth selected for medical benefits that were provided. But that also makes sense. The reason for identifying the child's habitual residence is to determine which country should make the custody determination. And if the parents and child have lived in only one place, it's logical for that country to make the determination, again, absent unusual circumstances. Kagan. Which, as you say, is what Judge Boggs said. And so I'm curious as to why you're not just accepting that as a formulation of the legal standard. Judge Boggs was careful to say absent unusual circumstances. And I suppose I would say that the benefit of doing that is, you know, if you take this Solicitor General's test, this is on page 26 and 27, I'm not going to read it because it would take too long to do all the factors that they think ought to go into this inquiry. And I guess I'm a little bit afraid. I mean, I don't mind totality of the circumstances tests when they make sense. But I guess I'm a little bit afraid that by the time you get through all those factors, everybody's going to have forgotten what the ultimate question is. And if the ultimate question is just where does the child usually live, then why not just sort of say that when it comes to an infant or a very small child, the child usually lives where the child has lived with both parents all her life? Well, I don't want to resist a rule that would be beneficial to my client. But I guess I will say that the courts, especially in the U.K., have had a lot of experience with subsidiary legal principles like that being developed. And I think the result, and I think Chief Justice Hale mentions this as one decision, is that they do get too much credence in how lower courts approach the case. And so I think the danger of adopting subsidiary legal rules is that they will end up being applied, as the Solicitor General said, in a broader context than they should be. Wouldn't all the work be done on absent unusual circumstances, though? And so you would still have the out, as Justice Kagan points out, for people to argue that it's... I think so. And I'm not sure, Justice Kavanaugh, that there's much difference between saying that as a legal principle or framing it the way Justice Breyer did, which is when the facts are that the child has lived in one country with her parents for her whole life, absent some unusual facts, that is going to lead to this decision. Well, what this take-everything-into-account-and-be-flexible standard seems to mean in practice, and you can tell me if this is wrong, is there are a lot of different considerations, and they may, particular considerations may be more important in one case than in another case. So we're just going to dump this in the hands of a particular judge to make a decision that that particular judge thinks is fair in accordance with that set of your judgments, and we're not going to make it, we're going to make it very hard to get that reversed. That's what this all seems to boil down to, with a lot of highfalutin language by the foreign courts. Am I wrong on that? I'm not sure that that's right, Justice Alito. I think there is an ultimate inquiry, where does the child usually live, or in the European version, the family and social environment in which the child's life has developed. I think that gives you a North Star. I think the problem is there are a lot of different facts in these cases. You know, it's one reason why in family law, best interest of the child is a very broad standard, because there are a lot of different facts. And so I think you can lay out, as we've, as this colloquy indicates, you can say, for example, when you have a child who has lived only in one place, there is a pretty clear factual result that's going to obtain, absent something odd. The difficult cases really are these multiple country cases. Those are the cases where there are a myriad of fact patterns. Why did the child move? What were the parents' views when the child moved? Did the child get acclimated to the new country? Those are very complicated cases. In the case of an infant, why does it matter that the infant has lived all of his or her life in a particular country? It wouldn't matter to that infant what country the infant was living in, or whether the infant was living on the moon. The infant's world is the home with the parents or a parent. So why does it matter? Well, it matters that the infant has lived in the same country with the parents. That's the critical, I think, additional fact. And I think the interest, there are two interests that are served. One is, the theory of the convention is, that's the lot, finding habitual residence is important for two reasons. One is to identify the place where the custody determination should be made, as opposed to leaving it to the unilateral decisions of one parent or another. The second is to decur these abductions, which are not only harmful in that they allow the gaming of jurisdictional rules, but they're harmful because they take the child away from both parents. One parent is unilaterally taking the child away from the other. And so what the ---- So you're putting that mother in the position of, if she wants to escape domestic violence, she has to leave her child behind. Well, she doesn't have to. She can escape domestic violence by separating from her husband and staying in the country. She, before she left, she spent two weeks under the protection, in safe houses, under the protection of the mechanisms that Italy has for that purpose. So I don't think that the test requires that she stay with the husband. I think one of the unusual facts could be, in a situation where it was clear that the abused parent wanted to get away, was determined to get away, and the evidence is the husband thwarted her at every turn. That's not what the district court found here, however, because the district court found, and just to quote two findings, on Petition App 98A, she continued after the birth of her child to live in Italy and had no definitive plans to bring her to the United States until the last altercation which precipitated her departure. And at 94A, most of the steps that Manaski took in March 2015 seemed to reflect a settled purpose and intent to remain in Italy at least for an undetermined period of time. So the district court looked at all this and said that wasn't the case here, and I think those are actually factual findings. Those aren't even mixed questions. Breyer. What do we do about it? I mean, I think in their brief they said she doesn't speak Italian and doesn't have a job. And what do you do about, and this standard that I read, which he didn't mention this, but it says you can't place the child in an intolerable situation. I think where the mother is being beaten up, that would be an intolerable situation. What do you do if the mother is in a country where there are difficulties with abused women finding adequate care and she's got to get out of there? All right. Well, what do we do about that? As I say, I think that could be a relevant fact that might lead the general rule that we're talking about to be superseded. Do we put it in here or do you say in dicta or something that it was raised an intolerable situation includes that or do we say nothing at all? Well, there are two options for addressing that, right? One is to say that if the district court were to find that the mother was trying to get away and she had it at the quickest possible moment, but she was thwarted because the father was preventing it through abuse or otherwise, then that might well mean that there is no habitual residence. That is not, as the findings that I read, that's not the case here. You could also look to the Article 13 exception and talk about the possibility that those facts may be relevant. As my colleague noted, that was the case. But isn't Article 13 about abuse of the child? It is about abuse of the child, and so that requires a broader finding. So it may be that the first approach is a better one. Let me answer a question about the difference between you and the government. You, I thought, urged that shared parental intent is relevant but not dispositive, one factor among others to be weighed. But if that is the case, doesn't that suggest the government's position a remand because at least the majority of the Sixth Circuit seems to focus on this shared parental intent? Well, let me answer that in two ways, if I may, Justice Ginsburg. First of all, I think it's important to unpack the phrase shared parental intent. I think the way the lower courts, as we discussed in our brief, the way the lower courts in the United States have applied that is what's the intent of each parent? That can be proven by words, deeds, objectively. What is the parent's intent with respect to the location of the child? There is perhaps one case in which a Federal Court of Appeals indicated that a meeting of the minds might be necessary, and even that court relied on an alternative ground. So I think the question is, is the intent of the parents with respect to where the child lives relevant? I think yes. It can be proved. They don't have to have jointly agreed. They can each have the same intent. In terms of this case, I think if we prevail on the legal issues, then that issue is determined because there's no clear error in the district court's determination. So the question would be, are there other facts that would be cognizable under the habitual resident standard that the lower courts didn't address? And our submission is those other facts are all facts that weigh in favor of Italy because they're principally the fact that the child has been located in Italy for her whole life before she was removed. And that's not something that was relevant necessarily to intent, but that's clearly a highly important fact that she was there with both parents. And so we don't see any other facts that could be adduced in this record. Four-day trial was quite comprehensive. We don't see any other facts that could be relevant that would require or even permit a different determination on the habitual residency determination, which is why we think a remand isn't necessary. Kagan When you, and to the extent you know it, the SG, talk about totality of the circumstances for older children, does that mean rejecting the view of most of the circuit courts that the key thing is acclimatization? No. I think acclimatization as children get older can be highly relevant. And the courts that have adopted this test, the foreign courts, have said that. I think the problem I think most courts have done more than just say that's highly relevant. Most courts have said that's the question that we're trying to answer. And that provides a kind of anchoring mechanism for courts, right? Okay, now I understand what the question is. It's a kind of embeddedness in a particular country's life. So, you know, but if it's just like one thing that gets thrown in along with everything else, that seems sort of different to me. I think the problem is there's no bright line between when you might think the young child standard applies and when you might think acclimatization becomes relevant. There probably are crossing lines. At one point, it's really about the young child and is he or she with her parents. And then at some point later, when the kids are 15 years old, it may be much more about them than about parental intent. I think most courts have been reluctant to say the parent's intent becomes irrelevant. I think they, the courts generally say acclimatization becomes much more relevant. So I wish I could help you with saying that there's a dividing line there. Isn't that what the European court said with respect to infants? It didn't say that you put parental intent or agreement as being the most important. It used the word just an important factor, I think, with your language. I think that's exactly right, Your Honor. So how do I discern that the mother's intent was to stay in Italy or that the child had acclimated to Italy or integrated into Italy when the child was being, during those eight weeks, she was moved from one spot to another. She didn't live consistently with the father. They were separate. Well, she moved between two places. Between two places, but the father wasn't in the first place. Then the mother went for a couple of weeks with the father and then brought her back into the shelter. The mother, I think, had some fairly potent evidence that she was making plans to leave Italy. Everything about the entire situation surrounding this child was simply up in the air. Well, I think those So why couldn't a court reasonably conclude that no settled place, no ordinary place had yet been formed for this child? That's a possibility we haven't talked about, but I have to presume that if we tell a court that it's the totality of the circumstances, that it is in fact one of the options it has. I think it is. In this case, I think the portions of the district court's opinion that I read on page 94A and 98A preclude that in this case because the district court rejected that as the mother's intent. I think for the reasons that we've been talking about, and I'd also say the movement from place to place is something that lower courts have rejected if it's within one country, because the idea here is to find the country of habitual residents. And if those movements, the Second Circuit said, speaking through Judge Cabranes, if those movements are within the country, they don't really count when they're within two places. I wanted to mention Justice Breyer raised a question about Italy and what the proceedings might be there. There is a proceeding in Italy, a custody proceeding, that a petitioner actually this past October has filed a custody petition. She filed some prior petitions. They were rejected on jurisdictional grounds. As I understand it, this petition is in the right Italian court and raises the custody question. Ginsburg. But what about this ex parte declaration depriving her of her parental rights? That's still standing. I think that's one of the issues that will be adjudicated in this Italian proceeding. And as Justice Sotomayor pointed out, the current status is that the legal custody of the child is with the Italian authorities. The father has generally physical custody. The mother has visitation rights. There are periodic reports being filed by the Italian social services authority about what's going on. So the Italian authorities are pretty seized of this matter. So just to return to the question of the remand, I think our view is, for the reasons I was discussing, that the district court's findings really deal with the intent issue, his factual findings, putting aside his ultimate determination on habitual residence. All of the other facts that could possibly be relevant under the Judge Boggs standard framed as a factual presumption, we think weigh in favor of Italy as the place of habitual residence. And we agree that it would be great to cut off these proceedings. Tomorrow will be the three-year anniversary of AMT being returned to Italy. And it would certainly be good for this uncertainty to be lifted so that she could then, the Italian authorities could proceed with the custody determination without this issue being raised. And I do think, as several members of the Court said, that there would be significant problems with the issuance of a re-return order, both in terms of a U.S. court's ability to issue such an order given the equitable considerations and also the extent to which such an order would be accepted by the Italian authorities. Unless the Court has any further questions. Thank you. Roberts. Thank you, counsel. Two minutes. Mr. Tirani. Thank you. Three points, Your Honor. With respect to the standard applied by foreign courts to cases involving infants, I would point the Court to paragraph 55 in the European Union Court of Justice's decision in the Mercredi case. The Court there stated that an infant necessarily shares the social and family environment of the circle of people on whom he or she is dependent. Consequently, where the infant is in fact looked after by her mother, it is necessary to assess the mother's integration in her family and social environment. That is the standard that Lady Hale adopted in the A v. A case at paragraph 54, sub 6. Applying that standard in this case leads to one clear, inexorable conclusion that Monaschi was not integrated into a family and social environment in Italy, and therefore AMT did not have a habitual residence in Italy. This Court need look no further than the party stipulation at JA28 and JA29 that as early as August of 2014, Monaschi was already laying the groundwork for her return to the United States by looking for U.S. health care and child care options, U.S. employment and U.S. divorce lawyers. This Court need look no further than JA200 and JA217, which are e-mails between the parties sent in the critical days preceding and following AMT's birth, where Monaschi reiterated her intent to return to the United States and to divorce Taglieri. And this Court need look no further than Pet App 94A, where the district court found that Monaschi intended to return to the United States with AMT as soon as possible. That's precisely what she did. The day AMT's U.S. passport arrived, when AMT was eight weeks old, Monaschi fled the dangerous situation in which she found herself and returned to the United States. This Court can and should make that determination, and it should order AMT's return to the United States for a full and fair child custody hearing, which is the only venue in which that hearing can take place. Thank you. Thank you, counsel. The case is submitted.